In re CAMPBELL SOUP COMPANY
SECURITIES LITIGATION.

No. CIV A 00–152 JEI.

United States District Court,
D. New Jersey.

June 19, 2001.

Rodriguez & Richards by Lisa J. Rodriguez, Haddonfield, NJ, Counsel for Plaintiffs.

Berger & Montague by Sherrie R. Savett, Stuart J. Guber, Darin R. Morgan, Philadelphia, PA, Counsel for Plaintiffs.

Schatz & Nobel by Andrew M. Schatz, Jeffrey S. Nobel, Patrick A. Klingman, Robert W. Cassot, Hartford, CT, Counsel for Plaintiffs.

Riker, Danzig, Scherer, Hyland & Perretti by Alan E. Krause, Morristown, NJ, Counsel for Defendants.

Cravath, Swaine & Moore by Paul C. Saunders, Max R. Shulman, Worldwide Plaza, New York, NY, Counsel for Defendants.

## OPINION

IRENAS, District Judge:

Presently before the Court is Defendants' Campbell Soup Company, Dale F. Morrison, and Basil L. Anderson's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337. For the reasons set forth below, Defendants' motion to dismiss is denied.

## I. BACKGROUND

In considering this Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true the facts as alleged in the Amended Complaint and any reasonable inferences that can be drawn therefrom. *See Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). Accordingly, the following recitation does not represent findings of fact by the Court.

Plaintiffs brought this putative class action on behalf of all persons who purchased the common stock of Campbell Soup Company ("Campbell" or "the Company") between September 8, 1997, and January 8, 1999, with the exception of defendants, the Company's officers and directors, their families, and any controlled entities.

Defendant Campbell, which is headquartered in Camden, New Jersey, is the world's largest manufacturer and marketer of soup products, with reported fiscal year 1998 sales of approximately $6.7 billion. (Am. Compl. at ¶ 18). The Company's primary customers are wholesalers and grocery store chains. (Id. at ¶ 40). Campbell's stock trades on the New York Stock Exchange. (Id. at ¶ 18). At all times relevant to the Amended Complaint, Defendant Dale F. Morrison ("Morrison") was President and Chief Executive Officer of Campbell and a member of its Board of Directors. (Id. at ¶ 19). Defendant Basil L. Anderson ("Anderson") was, at all relevant times, Executive Vice President and Chief Financial Officer of the Company. (Id. at ¶ 20).

In the years leading up to 1997, when Morrison was appointed President and CEO, Campbell experienced great success, with increasing sales, gross margins, and profits, and a consequent increase in its stock price. (Id. at ¶ 32–33). In its 1997 Annual Report, the Company disclosed that the increases in 1997 and 1996 "were due principally to continued productivity gains in manufacturing and higher selling prices." (Id. at ¶ 33). Analysts noted that, because the retail price of Campbell's soup was approaching $1.00 per can, which was viewed as a break point for retail consumers, further growth would need to come primarily from increased sales volume. (Id.) Thus, Plaintiffs allege, when Morrison took over the Company in June 1997, he faced the substantial challenge of maintaining Campbell's impressive growth while finding new avenues for that growth. (Id.)

Plaintiffs claim that, while the Company looked for new opportunities for growth in foreign markets, Defendants pursued a plan to dramatically increase the volume of domestic soup sales. However, in early 1997, Campbell's customers, in anticipation of an imminent price increase, had bought large quantities of soup to take advantage of the then-current price. (Id. at ¶ 36). Plaintiffs allege that this bulge in purchases reduced subsequent demand and that, faced with this reduced demand, Defendants sought to spur purchases by offering significant quarter-end discounts. (Id. at ¶ 37).

This sales effort was directed by William Toler ("Toler"), the head of marketing, and Ron Gable ("Gable"), Vice President of Supply Chain. Toler reported to Mark Leckie ("Leckie"), President of the U.S. Grocery Division, who reported to Morrison. Gable reported directly to Morrison. (Id. at ¶ 38). Plaintiffs allege that Morrison and William O'Shea, who served under Anderson as Comptroller, would give Toler revenue targets that the Company needed to report in order to meet analyst estimates. (Id. at ¶ 39). Toler, through frequent and sometimes daily conference calls, would discuss these targets with his marketing team and would authorize ever larger "discounts" necessary to induce customers to take product which the Company would then "load" onto trucks by the end of each fiscal quarter. (Id. at ¶ 40).

This "loading," as the practice was called, included discounts of up to fifteen to twenty percent. (Id. at ¶ 41). Plaintiffs contrast these large discounts with the modest two to three percent discounts that Campbell traditionally offered its customers in exchange for in-store advertising

and promotions of Campbell's products. (Id.). Although the "loading" discounts were significantly larger than the traditional discounts and were not offered in exchange for marketing concessions, Plaintiffs allege that Defendants nevertheless reported these discounts as "sales, general and administrative expenses" ("SG & A")—in other words, marketing expenses—rather than as deductions from gross revenue, as, Plaintiffs claim, is required under generally accepted accounting principles ("GAAP"). (Id. at ¶ 86(h)).

Plaintiffs further allege that, after Campbell's customers indicated that they did not have enough space to store the product that Campbell was pushing them to buy, Defendants implemented a plan to ship and warehouse product for its customers. (Id. at ¶ 42). As Plaintiffs claim, Defendants used forty to fifty warehouses, owned or leased by Campbell, to store the product. (Id.). Defendants also arranged for trucks to pick up the product, drive to other areas of the lots at Campbell facilities, and wait there until the product was to be delivered to the customers. (Id.). Up to one hundred trucks may have been involved in this process. (Id.). Plaintiffs allege that, because Campbell did not have enough trucks to handle the large amount of product "loaded" at the end of each quarter, the Company, specifically Gable, arranged for third party shipping companies to provide assistance. (Id. at ¶ 43).

Plaintiffs allege that Campbell realized the revenue from this product during the quarter in which it was "loaded," even though: (i) the product was not delivered until after the quarter ended; (ii) Campbell paid for the additional shipping, storage, and handling of the product; (iii) there was no transfer of risk of loss; and (iv) there was no legitimate business reason for the customers to purchase products under those conditions. (Id. at

¶ 85(c)). As a result, Plaintiffs contend, Defendants improperly reported the "sales" as legitimate revenue earlier than they should have. (Id. at ¶ 44).

Plaintiffs claim that Defendants further induced Campbell's customers to take additional product by offering a "guaranteed sales" policy, whereby customers could return unsold product within a reasonable period of time. (Id. at ¶ 46). Although Defendants allegedly believed that the customers would not return product because of its long shelf life, Plaintiffs contend that the returns ended up being quite significant. (Id.). Plaintiffs indicate that return levels were so high that Toler sent out a memorandum stating that his approval was required before any further "guaranteed sales" were made. (Id.). Plaintiffs claim that Campbell's "guaranteed sales" policy violated GAAP because Defendants recognized these sales as revenue even though future returns could not be reasonably estimated and Defendants did not provide a reserve for returns in their financial statements. (Id. at ¶ 85(d)).

As a result of these sales practices, Plaintiffs allege, several of Campbell's major customers had almost a year or more of advance inventory of Campbell's soup products. (Id. at ¶ 47).

Plaintiffs allege that these practices, and concerns about their propriety, were discussed among senior management, including Morrison and Anderson, and that Morrison received memoranda reviewing the practices. Plaintiffs also claim that Morrison rejected recommendations that the Company stop such improper practices. (Id. at ¶ 45).

Throughout this period, the Company reported impressive, often record, growth. (Id. at ¶¶ 49–75). As Defendants disclosed in quarter-end press releases, SEC filings, and annual reports, reported sales and earnings steadily increased, due to, Defen-

dants claimed, "volume-driven growth" and increased advertising and marketing, among other factors. (Id.). Defendants also represented in their filings that "shipments are made promptly by the company after receipt and acceptance of orders." (Id. at ¶¶ 52, 71). As the Company consistently met analysts' expectations, the stock price rose accordingly. (Id. at ¶¶ 49–75). However, Plaintiffs allege, Defendants never disclosed in its public releases or SEC filings its engagement in, nor the extent of, its allegedly improper sales and accounting practices.

On January 11, 1999, Defendants announced that fiscal year earnings would fall short of analysts' estimates due to "unusually warm weather" and "major inefficiencies throughout the supply chain, including procurement, manufacturing, shipping and storage of products." (Id. at ¶¶ 76, 78). As a result of the announcement, Campbell's stock price dropped almost sixteen percent from the previous close, from a high of $53.9375 per share on January 8, 1999 to a closing price of $45.375 per share on January 11, 1999. (Id. at ¶ 80).

As reported on January 12, 1999, Morrison told Wall Street analysts that "Campbell planned to end its long-time practice of offering retailers rebates and steep discounts at quarters end as a way to entice stores to stock up on soup so Campbell can meet its sales target." (Id. at ¶ 87). However, Plaintiffs allege, Defendants still did not disclose the true extent of the improper "loading" and "shipping" practices nor the improper accounting practices. (Id.). As Campbell's sales and earnings suffered during the remainder of fiscal year 1999 and the beginning of fiscal year 2000 due, in large part, to Defendants' decision to cease its allegedly improper sales practices, Campbell's stock price correspondingly declined, to $40.68 per share on Feb-

ruary 16, 1999, and, after a slight rebound, to a 1999 low of $37.44 per share on December 21, 1999. (Id. at ¶ 88).

In January 2000, ten identical class action complaints were filed against Defendants, and were later consolidated into a single action. On July 27, 2000, Plaintiffs filed a consolidated amended class action complaint ("Amended Complaint"). The Amended Complaint alleges that: (1) Defendants, by not revealing their allegedly improper sales and accounting practices, violated Section 10(b) by disseminating false and misleading statements and failing to disclose material facts necessary to make those statements not misleading; and (2) the individual defendants-Defendants Morrison and Anderson-were controlling persons of the Company, and, as such, caused the Company to engage in its allegedly wrongful conduct, in violation of Section 20(a).

On January 12, 2001, Defendants filed the instant motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Defendants contend that: (1) Defendants did not have a duty of disclosure; (2) Plaintiffs failed to sufficiently plead that Defendants acted with scienter as required under the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b); (3) Plaintiffs failed to identify the nature and extent of counsel's investigation; (4) Plaintiffs failed to state a claim under Section 20(a); and (5) Plaintiffs' new claims in the Amended Complaint are barred by the statute of limitations.

## II. RULE 12(b)(6) STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the court will accept as true all of the factual allegations contained in the complaint and any reason-

able inferences that can be drawn therefrom. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although the court must assume as true all facts alleged, "[i]t is not … proper to assume that the [plaintiff] can prove any facts that it has not alleged." *Associated General Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Finally, when "[c]onfronted with [a 12(b)(6) ] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

### III. SECTION 10(B) CLAIMS

*A. SECTION 10(B) AND RULE 10B–5*

Section 10(b) and Rule 10b–5 address "false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997). Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, … [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe…." 15 U.S.C. § 78j(b). Rule 10b–5, in turn, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading … in connection with the

purchase or sale of any security." 17 C.F.R. § 240.10b–5(b).

■ To establish a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that: (1) the defendant made a representation or omission of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the proximate cause of its injury. *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 871 (3d Cir. 2000) (citing *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir.1997)); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537 (3d Cir.1999) (citing *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir.1996)). The instant Motion focuses on the first and second prongs.

■ For a defendant to be found liable for non-disclosure, a plaintiff must first establish that the defendant had an affirmative duty to disclose. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b 5.") However, once a disclosure is made, the disclosing party has an obligation to ensure that the representations are accurate. *Cf. Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 n. 7, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (citing *Berg v. First American Bankshares, Inc.*, 796 F.2d 489, 496 (D.C.Cir.1986)). In the context of Section 10(b) and Rule 10b–5 actions, "[a] statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it." *In re Nice Sys., Ltd. Sec. Litig.*, 135 F.Supp.2d 551, 573 (D.N.J. 2001) (Lechner, J.) (citations and internal quotations omitted).

■ To be actionable, a representation or omission must also be material. *Basic*, 485 U.S. at 238, 108 S.Ct. 978. Material

information is defined as "information that would be important to a reasonable investor in making his or her investment decisions." *Burlington*, 114 F.3d at 1425. "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir.2000). "Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism, 'which constitute no more than 'puffery' and are understood by reasonable investors as such.'" *EP Med-Systems*, 235 F.3d at 872 (quoting *Advanta*, 180 F.3d at 538) (internal quotations omitted).

■ In *Burlington*, the Third Circuit announced an alternative standard for determining materiality in the context of an "efficient" market. *Burlington*, 114 F.3d. at 1425; *see also Oran*, 226 F.3d at 282. Recognizing that "efficient markets are those in which information important to reasonable investors," the *Burlington* court concluded that "the concept of materiality translates into information that alters the price of the firm's stock." *Burlington*, 114 F.3d at 1425. "As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following the disclosure, of the price of the firm's stock." *Oran*, 226 F.3d at 282.

## B. PLEADING

### 1. Rule 9(b)

■ Because claims brought under Section 10(b) and Rule 10b–5 are "fraud"

claims, a plaintiff alleging such "false or misleading statements or omissions of material fact" must comply with the heightened pleading requirements of both Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u–4 *et seq.; Oran*, 226 F.3d at 288; *Advanta*, 180 F.3d at 530.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). This heightened standard gives "defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *Burlington*, 114 F.3d at 1418.

■ However, because "application of the Rule prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud[,] ... the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *Id.* (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284–85 (3d Cir.1992)) (internal citations omitted).

That said, even under a relaxed standard, "boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Burlington*, 114 F.3d at 1418 (citing *Shapiro*, 964 F.2d at 285) (italics omitted).

### 2. Private Securities Litigation Reform Act

■ In response to inconsistency among the circuits as to the appropriate pleading standard and to an increasing number of

frivolous "strike suits" aimed at achieving quick settlements, Congress passed the PSLRA in 1995 to supplement the Rule 9(b) standard with a "uniform and stringent pleading requirement." S.Rep. No. 104–98, at 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694. The PSLRA requires that, in 10(b) and Rule 10b–5 actions, the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). As a result, the Court must scrutinize intensively the allegations of fraud in the complaint and consider each allegation separately. *Westinghouse,* 90 F.3d at 712.

## C. ALLEGEDLY FRAUDULENT STATEMENTS AND PRACTICES

### 1. Background

Before analyzing the allegedly fraudulent statements, it is necessary to review briefly the background against which, Plaintiffs claim, the allegedly fraudulent statements or omissions were made. Campbell's growth in the years leading up to fiscal year 1997 were driven to a large extent by increases in the price of its soup products. (Am.Compl.¶ 32). During the third quarter of fiscal 1997, which ended April 27, 1997, there was a large "buy in" of soup by Campbell's customers in anticipation of an impending price increase. (Id. at ¶ 36). As Defendants would later report, "[t]he increases in 1997 and 1996 were due principally to continued productivity gains in manufacturing facilities and higher selling price." (Id. at ¶ 33).

However, Plaintiffs allege, because retail prices of Campbell's core soup products were approaching $1.00 per can, which analysts believed was an upper price limit, Defendants recognized that future earnings growth would need to come from increased sales volume. (Id.). Plaintiffs allege that, due to pressure to maintain Campbell's growth, Defendants instigated a plan to increase sales through "loading"—offering customers discounts of 15%–20% at the end of each quarter to meet sales targets, which they reported as SG & A expenses. (Id. at ¶ 41). As Plaintiffs allege, the normal level for such discounts was 2%–3%, and in exchange Campbell traditionally received concessions from customers such as in-store advertising or promotions. (Id.)

Plaintiffs further allege that, after Campbell's customers took advantage of the quarter-end discounts and saw their inventories balloon, Defendants, fearing that further sales would be stymied, initiated an effort to continue its advance sales by offering to store "sold" product on behalf of its customers. (Id. at ¶ 42). To provide further incentive to its customers to purchase Campbell's soup, Plaintiffs claim that Defendants offered customers a "guaranteed sale" policy, whereby customers could return unsold soup within 90 days. (Id. at ¶ 46). Contrary to Defendants' expectations, returns ended up being so significant that further sales under the "guaranteed sale" policy needed to be approved. (Id.).

Plaintiffs allege that Defendants' statements during the class period were misleading by their failure to disclose the improper sales and accounting practices which inflated the Company's sales and revenue estimates to meet Wall Street's expectations. Specifically, Plaintiffs claim that, by not revealing these practices, Defendants misrepresented the Company's current and past performance as well as its growth projections. Plaintiffs further allege that Defendants deviated from generally accepted accounting practices in an

effort to mask their sales practices and report revenue prematurely.

## 2. Loading and Shipping Practices

Through a variety of press releases, filings, and reports in September October 1997, Defendants announced that Campbell had had "record" sales and earnings in the fourth quarter of fiscal year 1997, which ended on August 3, 1997. (Id. at ¶¶ 49, 50). In the September 8, 1997 press release, Defendant Morrison stated, "This was another outstanding year for Campbell. Our core business—soups and sauces, biscuit and confectionary and food service—grew 10 percent in sales and 15 percent in earnings. Company gross margins grew by 2.7 points to 45.9 percent, our strongest gain in the last five years." (Id. at ¶ 50). Campbell's sales and earnings were reiterated in Campbell's 10–K, filed with SEC on October 23, 1997. (Id. at ¶ 51). This filing also represented that "[s]hipments are made promptly by the company after receipt and acceptance of orders." (Id. at ¶ 52).

In its September 9, 1997, meeting with analysts, as reported by Deutsche Morgan Grenfell, Campbell reported that its 8% growth in the wet soup category "was comprised of 6% from pricing, 1% from an improved mix, and 1% from consumption growth." (Reply Decl. Of Max R. Shulman Ex. 1 at 7). In the same meeting, Defendants represented their commitment and belief that, in fiscal year 1998, Campbell would experience eight percent growth in the U.S. market, with three percent growth in U.S. sales volume. (Am. Compl. at ¶ 53).

In November 1997, Defendants released results for the first quarter of fiscal year 1998, announcing in a November 18, 1997, press release that Campbell has again achieved "record" sales and earnings. In the press release, Defendant Morrison stated, "Sales in our core businesses ... grew 7 percent and earnings increased 12 percent in the quarter. We are continuing to expand our gross margins across the company through productivity gains and improved product mix.... U.S. soup unit volume rose 2 percent...." (Id. at ¶ 55). A few weeks later, on December 17, 1997, Defendants filed Campbell's quarterly report on Form 10–Q with the SEC, reflecting the same information announced in the press release. (Id. at ¶ 57).

At the close of the second quarter of fiscal year 1998, Defendants, in a February 17, 1998 press release, again announced "record" sales and earnings. (Id. at ¶ 58). Defendant Morrison stated, "Our continued excellent earnings per share performance demonstrates our strategic growth plan is on track. Sales in our core businesses grew 8 percent in the quarter.... Continued strong productivity gains led to a 2.6 percentage point gain in our gross margin." (Id. at ¶ 59). The press release also disclosed that U.S. soup sales increased two percent during the quarter. (Id.). On or about February 25, 1998, Defendants filed Campbell's 10–Q with the SEC. (Id. at ¶ 61).

On May 19, 1998, Defendants released results for the third quarter of fiscal year 1998, disclosing that sales in soup and sauces increased four percent and that operating earnings increased eight percent, after a restructuring charge. (Id. at ¶ 62). Defendant Morrison stated that "U.S. soup is a key area of focus.... We are also developing more effective go-to-market strategies consistent with our emphasis on volume driven growth." (Id. at ¶ 63). Defendants filed these numbers with the SEC on Form 10–Q on or about June 7, 1998.

In a September 3, 1998, press release, Defendants announced year-end results for fiscal year 1998. (Id. a ¶ 67). The release

indicated that soup and sauce sales had increased six percent for the year, with U.S. wet soup sales up six percent. (Id. at ¶ 68). Defendant Morrison reported,

> Our reconfiguration and accelerated productivity programs continued to expand gross margins, which were up 3.3 points to 51.7 percent in fiscal 1998.... We are a more focused company and we are excited about our growth plan for the new year. U.S. soup is our highest priority. Across our businesses we have new products, new advertising and new marketing initiatives to build on Campbell's strong equity with consumers and to drive volume growth.

(Id. at ¶ 67). On October 9, 1998, Defendants filed the company's Form 10–K with the SEC. In this filing, the Company again reported that "[s]hipments are made promptly by the company after receipt and acceptance of orders." (Id. at ¶ 71).

For the first quarter of fiscal year 1999, Defendants, in a November 18, 1998, press release, announced that U.S. wet soup sales volume rose four percent. (Id. at ¶ 73). U.S. soup volume grew four percent. (Id. at ¶ 74). As Defendant Morrison stated, "We are especially pleased by the growth in U.S. wet soup consumption.... 'Campbell's' Red & White brands, especially Tomato soup, showed significant sales growth driven by increased advertising and merchandising...." (Id. at ¶ 73). Defendants filed their quarterly 10–Q with the SEC on December 16, 1998.

On January 11, 1999, Campbell announced that its fiscal year earnings would fall short of analysts' estimates. The Company stated that, due to "major cost savings initiatives in supply chain operations," there would be "lower soup shipments in the second quarter ending January 31, 1999 and for the fiscal year." (Id. at ¶ 76). The Company further announced that "[t]he supply chain initiatives ... focus on significantly improving supply chain management and reducing the variability in trade spending, which creates major inefficiencies through the supply chain, including procurement, manufacturing, shipping and storage of products." (Id.). In a conference call with analysts, Defendant Morrison said that unusually warm weather and "inefficiencies in the supply chain" were responsible for the decline in sales and earnings. (Id. at ¶ 78).

Because neither Plaintiffs nor Defendants have provided the full text of the cited Campbell's press releases, the Court must rely on the Amended Complaint's portrayals of the statements and omissions and the context in which they were made. And because this is a Motion to Dismiss under Fed.R.Civ.P. 12(b)(6), the Court must construe the alleged facts in the light most favorable to Plaintiffs.

Plaintiffs argue that, because the sales and earnings levels reported during the relevant period were achieved only through the Defendants' loading, and the reported growth projections were based on continued loading, Defendants were obligated to disclose their sales practices so as "to make the statements made, in the light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b–5(b). They further claim that, even when Defendants suddenly disclosed that there were "inefficiencies in the supply chain," Defendants still were not fully candid about the true nature of their sales practices. Moreover, Plaintiffs claim that Defendants' statements about "prompt shipments" were misleading if not entirely false.

 Defendants counter that companies need not disclose their sales practices, and that Plaintiffs' claims that the "loading" was extraordinary does not affect their disclosure obligations. (Defs.' Mem. L. Supp. Mot. Dismiss at 15; Defs.' Rep.

**588**

Mem. L. at 3).[1] Defendants rely on the proposition that "[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course . . . ." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 202 (1st Cir.1999).

However, Plaintiffs do not allege that the loading in and of itself was fraudulent. Nor does Rule 10b–5 provide for liability for such practices. What Rule 10b–5 does protect against, though, is a defendant's failure to disclose material information without which investors might reasonably be misled.[2]

█ In Defendants' quarter-end press releases, Defendant Morrison consistently referred to Campbell's "volume-driven growth." As pled, a reasonable trier of fact could very well conclude that these comments were not only not candid, but were misleading, and that a reasonable investor would want to know about the questionable sales practices behind this "volume-driven growth." Similarly, as Defendants' repeated statements that "shipments are made promptly" contradict the Company's alleged practice of storing "purchased" product in warehouses and trucks until its customers requested delivery, Plaintiffs have sufficiently pled that they are misleading and are material.

█ This is further confirmed by the fact that, when investors did learn of the

---

1. Defendants also allege that the Company's loading practices were known to the public through various analyst reports, which Defendants have included in their filings. Defendants contend that the Court should consider these reports because they undermine Plaintiffs' allegation that the Company's loading was not disclosed during the class period.

 As a general rule, a court ruling on a motion to dismiss may only consider the pleadings, exhibits attached thereto, and matters of public record. *Burlington,* 114 F.3d at 1426; *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). That said, a court may consider a "document integral to or explicitly relied upon in the complaint . . . without converting the motion into one for summary judgment." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996). The rationale behind this exception is that a plaintiff has notice of such a document and should not be able to predicate his fraud claim on statements taken out of the context of the entire document. *Burlington,* 114 F.3d at 1426.

 To support their assertion that the analyst reports fit the bill, Defendants cite *Pension Benefit* for the proposition that "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document." (Defs.' Mem. L. Supp. Mot. Dismiss at 5 n. 6 (quoting *Pension Benefit,* 998 F.2d at 1196)). However, *Pension Benefit* dealt with whether the court could consider an authentic copy of the purchase and sale agreement which was the basis

of the lawsuit. 998 F.2d at 1196 ("We now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted). That is hardly the case with the analyst reports.

Second, the Court would like to note that Defendants' counsel misrepresents the quoted language, which reads in full, "[o]therwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document *on which it relied." Id.* at 1196 (emphasis added). The "on which it relied" is the operative language here, and is the reason the Court will not consider the analyst reports—because there is no evidence that Plaintiffs relied on them. Misquoting cases is not acceptable in the Southern District of New York nor is it acceptable in the District of New Jersey.

Finally, even if the Court were to accept that the analyst reports disclosed the Company's loading, it is a question of fact whether these reports were widely available and thus whether a reasonable investor should have been aware of the information.

2. It is also worth noting that the court in *Greebel* was addressing whether channel stuffing provided indirect evidence of scienter, not whether the defendant's failure to disclose the channel stuffing was itself actionable. *See* 194 F.3d at 202–03.

"inefficiencies in the supply chain"—albeit stated in euphemistic fashion-and the consequent sales and earnings warnings, the Company's stock price dropped sixteen percent from its previous close. (Am. Compl. at ¶ 80). As discussed, in an efficient market, significant change in a stock's price may be determinative of whether a statement or omission was material. *Burlington,* 114 F.3d at 1425.

Even if Defendants believed that they would be able to mask such advance sales over the long run through growth in other markets, that does not obviate their obligation to provide an accurate representation of Campbell's then—current sales and earnings and their growth projections. (This leaves aside the fact that, even if the company achieved growth in other markets, future sales would still not be at the levels at which they would have been absent the loading.)

■ The Court recognizes that it is difficult to state an omission with particularity, as required by the PSLRA. However, Plaintiffs have pled with particularity the misleading statements and the context in which they were made. As a result, Plaintiffs have sufficiently alleged that, once Defendants disclosed their sales, earnings, and growth projections, they had the concomitant obligation to divulge their loading—"information that would be important to a reasonable investor in making his or her investment decisions." *Burlington,* 114 F.3d at 1425. Similarly, they had an obligation to disclose any information which would have qualified or corrected their allegedly false representation that shipments were made promptly.

### 3. Forward-looking Statements

However, Defendants argue that the statements made by the Company were forward-looking statements, and as such, are not actionable due to the safe harbor provisions of the PSLRA. 15 U.S.C. § 78u–5. The statute defines a "forward-looking statement" as, *inter alia,* "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial item . . . ." § 78u–5(i)(1). A defendant will not be liable for such forward-looking statements if the statement is either immaterial or if the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." § 78u–5(c)(1)(A).[3] However, a plaintiff can defeat the safe harbor by demonstrating that the statement "was made with actual knowledge . . . that the statement was false or misleading." § 78u5(c)(1)(B).

Plaintiffs counter that the statements were not forwardlooking statements, and, if they were, they were not identified as such and were not accompanied by any meaningful cautionary statements. In the alternative, they argue that Defendants had actual knowledge that the statements were misleading.

Defendants' statements at issue here fall into two categories: statements about the past performance, i.e. sales and earnings; and predictions about future performance, including the Company's plans and priorities.

■ Defendants contend that Plaintiffs allegations regarding Defendants' failure

---

3. The statute provides a similar framework for oral forward-looking statements. 15 U.S.C. § 78u–5(c)(2).

to disclose the "pervasive nature" of the loading and the "effect it would have on future sales and earnings" converted its statements into forward-looking statements. (Defs.' Mem. L. Supp. Mot. Dismiss at 16). Defendants argue that, "[i]n the real world in which businesses operate and issuers report," any number of factors may affect future performance, and "the law wisely does not require that an issue express an opinion or hazard a guess about the effect of any one of them—let alone all in combination—on future results." (Id. at 7). However, it is clear that Defendants' statements about past performance, which attributed the Company's positive results to "volume-driven growth" rather than loading, were stating what were represented as historical facts, not "projections of revenues," etc. As the court stated in *Burlington*, "earnings reports are among the pieces of data that investors find most relevant to their investment decisions.... Information concerning the firm's current and past earnings is likely to be relevant in predicting what future earnings might be." 114 F.3d at 1420 n. 9 (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 636 (1st Cir.1996)) (internal citations omitted). The fact that investors might make future predictions and investment decisions based on this information does not somehow make the information itself "forward-looking."

▆ On the other hand, at first glance, Defendants' statements about the Company's goals for and estimates of future performance would seem to fit within the safe harbor in that the statements contained "a projection of revenues, income (including income loss), earnings (including earnings

loss) per share, capital expenditures, dividends, capital structure, or other financial item...." 15 U.S.C. § 78u–5(i)(1). However, as presented in the Amended Complaint, such statements did not comply with the PSLRA's requirements to qualify for safe harbor protection. Because, in the absence of the full text, the Court must rely on the Amended Complaint, the Court must accept Plaintiffs' allegation that Defendants' statements were neither "identified as forward-looking statements" nor "accompanied by meaningful cautionary statements." § 78u–5(c)(1)(A).[4] As a result, these statements are not protected by the safe harbor provisions and thus are actionable. Accordingly, the Court need not determine whether the statements were in fact forward-looking statements or whether they were made with actual knowledge that they were misleading.

### 4. Item 303

Defendants also contest Plaintiffs' allegation that they were required to disclose their sales practices pursuant to Item 303 of Regulation S–K. 17 C.F.R. § 229.303. Item 303 mandates, *inter alia*, that a company "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." § 229.303(a)(3)(ii).

▆ In *Oran*, the Third Circuit held that Item 303 does not create an independent cause of action for private plaintiffs. 226 F.3d at 287 ("Neither the language of the regulation nor the SEC's interpretative releases construing it suggest that it was intended to establish a private cause

---

4. As previously discussed, the Court finds these statements—and the alleged omissions-material. § 78u–5(c)(1)(A).

Additionally, because of the alleged absence of cautionary statements, the Court need not

address application of the "bespeaks caution" doctrine. *See generally EP MedSystems*, 235 F.3d at 873–75.

of action....""). Nor does a violation of Item 303's disclosure requirement necessarily violate Section 10(b). As the court in *Oran* held, "because the materiality standards for Rule 10b–5 and [Item 303] differ significantly, the 'demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5. Such a duty to disclose must be separately shown.'" 226 F.3d at 288 (quoting *Alfus v. Pyramid Tech. Corp.*, 764 F.Supp. 598, 608 (N.D.Cal.1991)).

Recently, the Second Circuit, without addressing the contrasting materiality standards, held that a publisher's failure to disclose trends in declining sales and increasing returns, as required by Item 303, adequately alleged a securities law violation. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 70–75 (2d Cir.2001) (plaintiffs adequately alleged that defendants knew of material downward trend, despite fact that business was cyclical). As in this case, the *Scholastic* case involved allegations of aggressive sales tactics such as excessive discounts and altering its return policies in the face of declining sales, which the Second Circuit found supported allegations that the defendant was aware of the downward trends. *Id.* at 73–74. (The fact that returns are far more integral to the book business than they are to the soup business does not help Defendants here.)

The *Scholastic* opinion further bolsters the Court's conclusion that Defendants had a duty to disclose their loading and shipping practices. However, even absent Item 303, the Court has already held that Plaintiffs have sufficiently pled violations as to the heretofore discussed statements. As such, the unavailability of Item 303 as an independent avenue does not frustrate Plaintiffs' allegations.

### 5. Accounting Practices

The second set of Plaintiffs' allegation focus on Defendants' allegedly improper accounting practices. First, Plaintiffs claim that, in violation of GAAP, Defendants improperly recognized as revenue "sham" sales made under a "bill and hold" arrangement but in which there was no delivery before the end of the quarter and no transfer of risk of loss, and in which the Company paid for the storage and shipment of the product. Second, Plaintiffs allege that Defendants' "guaranteed sales" policy violated GAAP because future returns could not be reasonably estimated and the Company failed to provide for a reserve for returns. Third, Plaintiffs claim that, as required by GAAP, Defendants should have deducted the large discounts they offered their customers from revenue rather than treating the discounts as SG & A because they received no reciprocal concessions and the discounts were much large than traditional marketing discounts. Fourth, Plaintiffs contend that Defendants failed to disclose that the Company recognized material amounts of revenue on "bill and hold" and "guaranteed sales" transactions. Finally, Plaintiffs allege that Defendants failed to indicate adequately that the Company was changing its policies regarding the prompt shipment of its products and its recognition of revenue, in violation of SEC regulations and GAAP.

Defendants respond on a variety of levels. First, Defendants argue that, with regard to the "sham" sales and "guaranteed sales" allegations, Plaintiffs failed to plead sufficiently facts which would establish such violations. Second, as to the "guaranteed sales" claims, Defendants maintain that the Company was not required to maintain a reserve for returns because they did not believe the amounts of returns would be material. Third, De-

fendants argue that accounting for the discounts as SG & A was proper, and that the accounting standards that Plaintiffs alleged were violated were not in fact GAAP.

The bulk of Plaintiffs' allegations and Defendants' claims for dismissal revolve around GAAP. While "generally accepted accounting principles" are not a "canonical set of rules" that dictate uniform treatment, *see Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), "GAAP includes broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations." *Burlington*, 114 F.3d at 1421 n. 10 (quoting *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745, 750 (1992)). Whatever form GAAP does take, the SEC requires general compliance. "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate...." 17 C.F.R. § 210.4–01(a)(1).

As discussed above, Plaintiffs allege that Defendants engaged in a variety of improper accounting practices in an effort both to report revenue earlier than appropriate and to mask the improper sales and shipping practices they adopted to maintain their sales growth. First, Plaintiffs describe Defendants' offering huge discounts at the end of each quarter to create incentives for Campbell's customers to purchase increased quantities of product so that the Company could meet its sales targets. Plaintiff claim that these discounts were significantly larger than traditional marketing incentives and that the customers did not provide reciprocal concessions to the Company, such as special product placement or displays. As a result, Plaintiffs contend, it was improper for

Defendants to account for these discounts as SG & A rather than deducting the discounts from revenue. Plaintiffs cite accounting standards supporting their claim, disputing Defendants' contrary assertions. Moreover, Plaintiffs allege that Defendants' practice violated SEC Regulation S X, which requires that companies separately state SG & A expenses and "net sales," which the regulation defines as "gross sales less discounts, returns, and allowances." 17 C.F.R. § 210.5–03.1.

Plaintiffs next claim that, once it became clear to Defendants in the first quarter of fiscal 1998 that the Company's customer's inventories were filling, they offered "bill and hold" arrangements whereby the Company would sell customers product, but would store it at Campbell facilities until the customers needed it, at which time the Company would arrange delivery. While such "bill and hold" arrangements may be permissible, Plaintiffs claim that, in this case, delivery was not accomplished before the end of the quarter in which the "sales" were made, if at all, and that the risk of loss did not transfer to the customer until the product was actually delivered. As a result, Plaintiffs claim, Defendants violated established GAAP principles.

Plaintiffs also allege that, to further Campbell's sales efforts, Defendants implemented a "guaranteed sales" policy in which customers could return any product not sold within a reasonable period of time. As Plaintiffs contend, the volume of returns became so significant that the head of marketing sent out a memo requiring approval of any further sales made under the policy. This practice too had an accounting element. Plaintiffs contend that the policy violated GAAP because Defendants could not reasonably estimate future returns and because Defendants failed to provide a reserve for returns, as required by GAAP.

Plaintiffs next allege that Defendants further violated GAAP by failing to reveal in their financial disclosure statements that, through the "bill and hold" and "guaranteed sales" transactions, they had utilized "unusual or innovative applications of generally accepted accounting practices" or, at the least, one of a variety of alternatives, and had realized material amounts of revenue using these practices. Again, Plaintiffs cite relevant accounting principles.

Finally, Plaintiffs contend that Defendants were obligated to disclose that it had altered its policies and principles regarding the prompt shipment of product and recognition of revenue as stated in its prior filings. As Plaintiffs allege, Defendants' failure to reveal the changes violated GAAP.

■ Defendants argue that Plaintiffs fail to plead these allegations with sufficient particularity. More specifically, with respect to the "bill and hold" transactions, Defendants maintain that Plaintiffs failed to allege how widespread the practice was or how long the delay in shipments was. As to the "guaranteed sales," Defendants claim that Plaintiffs failed to specify the actual level of returns and how the returns were accounted for. As to all the claims, Defendants argue that Plaintiffs failed to allege sufficiently any material impact.

However, Defendants cite no caselaw holding that such specifics are required. The one case they do cite, *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir.1999), deals with improper accounting as evidence of scienter, which is an inquiry different than the one the Court is engaged in here.

On the other hand, Plaintiffs cite a host of cases supporting the proposition that Plaintiffs need not allege with numerical specificity the extent or impact of Defendant's allegedly improper accounting practices. *See, e.g., In re Computer Assocs. Class Action Sec. Litig.*, 75 F.Supp.2d 68, 73 (E.D.N.Y.1999); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97–C–2715, 1998 WL 781118, at *8 (N.D.Ill. Nov.4, 1998). As the Third Circuit stated in *Burlington*, "the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." 114 F.3d at 1418 (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir.1992)). While Plaintiffs will need to "fill in the details" to prove their claims, Plaintiffs have sufficiently plead the who, what, where, when, and how of the allegedly fraudulent practices and have sufficiently demonstrated that, if true, the practices would have had a material impact on Defendants' financial statements. *Cf. Advanta*, 180 F.3d at 534. Moreover, a trier of fact could well determine that a reasonable investor would want to know about Defendants' use of such practices and the extent of such use.

■ Defendants next argue that, with regard to the discounts claim, the accounting principle that Plaintiffs allege was violated is not part of GAAP. They cite accounting standards which they claim support their argument that the discounts were properly treated as SG & A, rather than deductions from revenue. They further argue that, even if the standard that Plaintiffs cite is GAAP, it was not adopted until after the class period in this litigation. Nevertheless, it is well-settled in this circuit that what accounting practices comprise GAAP is a question of fact best addressed through expert testimony and thus inappropriate for resolution on a motion to dismiss. *Burlington*, 114 F.3d at 1421; *Westinghouse*, 90 F.3d of 709 n. 9.

## D. ADEQUACY OF BASIS FOR FACTUAL ALLEGATIONS

Defendants also maintain that Plaintiffs' suit should be dismissed because it fails to adequately plead the basis for its factual allegations. They claim that Plaintiffs are required to reveal the nature and extent of "counsel's investigation" and the identities of the confidential sources on whom Plaintiffs relied.

The PSLRA requires that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). There has been significant dispute among the courts as to how strictly this requirement should be construed, particularly when the factual allegations are based on confidential sources.

In this district, Judge Lechner adopted a strict interpretation of the PSLRA requirement. See In re Nice Sys., Ltd. Sec. Litig., 135 F.Supp.2d 551, 568–73 (D.N.J. 2001) (Lechner, J.). Finding that "the PSLRA indicates that a plaintiff may not plead some facts and withhold others," Judge Lechner relied on the Ninth Circuit's holding in In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970, 984 (9th Cir.1999), that "the 'all facts' requirement for complaints pled on information and belief cannot be satisfied if plaintiffs fail to identify the sources upon which their belief is based." Nice Sys., 135 F.Supp.2d at 571. Canvassing the legislative history, Judge Lechner hangs his conclusion on comments made by Congressmen John Bryant and John Dingell critical of the language which was eventually enacted and in favor of less stringent language which was proposed but rejected. See id. at 570–71 (citations omitted); see also, e.g., In re Silicon Graphics, Inc. Sec.

Litig., 970 F.Supp. 746, (N.D.Cal.1997) ("[B]ecause Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language, ... plaintiffs must plead the sort of information described by Reps. Bryant and Dingell to meet the requirements of the [PSLRA] as enacted." (internal citations omitted)), aff'd, 183 F.3d 970 (9th Cir.1999).

■ However, this Court finds this reading of the legislative history unconvincing. First, legislative history representing the isolated statements of one or two congressmen carries much less weight than that reflecting the "collective understanding" of Congress or of a particular committee or conference. See Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). Moreover, the comments relied on in Nice Systems were "hyperbolic statements of legislators who were attempting to amend the proposed Act to lighten plaintiff's pleading burden," and thus may have been an effort to provide an alarmist characterization of the heightened pleading requirement. Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir.2000). It would be perverse to give greater credence to their negative spin on the enacted language simply because their proposed language was rejected.[5]

■ Rather, this Court finds persuasive the view adopted by the Second Circuit in Novak v. Kasaks, 216 F.3d 300 (2d Cir.2000). As the Novak court stated:

[N]otwithstanding the use of the word "all," paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plain-

---

**5.** For a more comprehensive analysis of the legislative history, see Harold Blumenthal, Securities and Federal Corporate Law § 16.25.8 (1999).

tiffs need only plead with particularity *sufficient* facts to support those beliefs. Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

*Id.* at 313–14. Coupled with the particularity requirement, this standard achieves (i) Rule 9(b)'s goals of providing defendants with fair notice of the claims against them and the factual basis of those claims, *see Novak,* 216 F.3d at 314, as well as (ii)

the PSLRA's goal of flushing out suits which are built on mere speculation and conclusory allegations and which aim to use discovery as a fishing expedition to substantiate frivolous claims.[6] *See In re Theragenics Corp. Sec. Litig.,* 105 F.Supp.2d 1342, 1355 (N.D.Ga.2000).

 In the instant matter, Plaintiffs have satisfied this standard. As discussed previously, Plaintiffs have sufficiently pled their allegations. Moreover, in addition to the numerous documents cited, the Amended Complaint specifies discussions, phone conversations, and memoranda addressing the basis of Plaintiffs' factual allegations and identifies numerous individuals who participated in those communications, as well as their positions in the Company. This specificity strongly suggests that Plaintiffs, without the benefit of discovery, have adequately investigated and substantiated their allega-

---

6. Furthermore, compliance with a strict interpretation of the "all facts" requirement might put plaintiff's counsel at risk of running afoul of the rules of professional responsibility in the course of his or her investigation. Most if not all jurisdictions restrict lawyers' ex parte communication with adversarial parties who are represented by counsel. As a result, it is unlikely that Congress would impose such a strict pleading requirement in the face of the ethical hurdles of satisfying it.

In New Jersey, the Rules of Professional Conduct ("RPC") provide, "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer ... unless the lawyer has the consent of the other lawyer...." RPC 4.2. In the context of organizations such as corporations, those persons deemed to be represented by counsel include the members of its "litigation control group," or in other words, "current agents and employees responsible for, or significantly involved in, the determination of the organizations' legal position in the matter...." RPC 1.13. The 1996 amendments to RPC 4.2 specifically rejected a broader formulation earli-

er adopted by some courts which barred communication with all employees whose conduct may directly impute liability to the corporation. *See* Report of the Special Committee on RPC 4.2, 139 N.J. L.J. 1161 (1995).

The Rules also recognize that former employees are presumed to be represented by the corporation's counsel if they had been members of the litigation control group. RPC 1.13. However, unlike current members of the litigation control group, former members may disavow such representation. This distinction was the result of the Special Committee's recognition that former members might have interests in conflict with those of the corporation. Regardless, lawyers engaging in preliminary investigations must tread carefully. *See* Notices to the Bar, 145 N.J. L.J. 318 (1996). For a history and discussion of these Rules, see *Andrews v. Goodyear Tire and Rubber Co.,* 191 F.R.D. 59 (D.N.J.2000) (Politan, J.); *Ex Parte Interviews: Treasure Trove of Information or Ethical Minefield?,* 160 N.J. L.J. 179 (2000). For a review of cases nationwide addressing ex parte communications with former employees, see Benjamin J. Vernia, Annotation, *Right of Attorney to Conduct Ex Parte Interviews with Former Corporate Employees,* 57 A.L.R.5th 633 (1998).

tions and, as a result, have allayed the PSLRA's concerns about frivolous and abusive fraud suits.[7] It is not necessary for—nor does the PSLRA compel—Plaintiffs to reveal confidential sources at this stage of the litigation.

### E. SCIENTER

One of the most significant aspects of the PSLRA was its introduction of a heightened pleading standard for scienter: "[T]he complaint shall, with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u–4(b)(2). In *Advanta,* the Third Circuit wrestled with the question of whether the PSLRA incorporated the Second Circuit's pleading standard for scienter as previously adopted by the Third Circuit in *Burlington. See Advanta,* 180 F.3d at 530–35. After determining that the legislative history was inconclusive, the Third Circuit held that the PSLRA departed from the prior standard only on a procedural level, by requiring that the "facts giving rise to a strong inference" of scienter be pled with particularity. *Id.* at 534.

■■■ However, the *Advanta* court held that the substantive elements of scienter were left undisturbed. *Id.* As a result, "it remains sufficient for plaintiffs [to] plead scienter by alleging facts 'establishing a

motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.' " *Id.* at 534–35 (quoting *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 318 n. 8 (3d Cir.1997)).[8]

In their Amended Complaint, Plaintiffs have portrayed in detail a comprehensive scheme by Defendants to increase sales and revenue through improper sales and accounting practices. After a large buy-in of soup in early 1997 in anticipation of an impending price increase, Campbell's customers' inventories were full. To maintain sales growth, Campbell allegedly offered increasing discounts to its customers to convince them to buy increasing amounts of product. Under pressure to meet analyst's earnings estimates, Defendant Morrison allegedly would notify various executives of the amount of revenue needed to meet the estimates. These executives would then give their sales force target numbers for sales, including authorization for increasing discounts to ensure these target sales levels. To mask these discounts and their impact of on revenue, Defendants reported the discounts not as a deduction from revenue but rather as SG & A expenses.

When Campbell's customers could no longer store any more product, the Company allegedly arranged to ship "bought" product to warehouses owned or rented by

---

**7.** The Court notes, for instance, that the memo produced by Defendants during oral arguments quite accurately corroborated the memo of which Plaintiffs learned during their investigation and which they described in the Amended Complaint (Am. Compl. at ¶ 46), save a mistake as to its author. Although Defendants offered the memo for a different point, it nevertheless gave the Court further confidence that Plaintiffs' Amended Complaint was supported by sufficient—and accurate—investigation.

**8.** "A reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Advanta,* 180 F.3d at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979) (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977))). "Conscious behavior" generally involves "intentional fraud or other deliberate illegal behavior." *Advanta,* 180 F.3d at 535.

Campbell until the customers' inventories decreased. Product was also stored on trucks which parked in lots at Campbell's facilities. Campbell allegedly even rented trucks from third parties to accommodate the volume of product "sold" but not shipped at the end of each quarter. These practices were allegedly discussed among senior officers of the company, including Defendants Morrison and Anderson. Defendant Morrison also allegedly received a memorandum regarding these practices during the summer of 1998, and rejected a proposal that the practices be stopped. Even though the product allegedly was often not shipped by the end of the quarter in which it was purchased, the Company improperly reported the sales as revenue in the quarter in which it was purchased.

In order to incentivize further sales and meet analysts' expectations, the Company also allegedly offered "guaranteed sales," whereby product could be returned if not sold within 90 days. However, Defendants failed to account properly for this return policy. Defendants' sales efforts were so successful that some customers had an entire year's worth of inventory. Despite numerous statements and filings by the Company and Defendant Morrison, these practices allegedly were never disclosed during the class period. After having consistently met analysts' estimates for several quarters in a row, on January 11, 1999, Campbell's stock price dropped 16% after the Company revealed that sales and earnings would fall short of estimates.

Defendants contend that Plaintiffs' claims are based on catch-all allegations and conclusory statements. Defendants maintain that Plaintiffs have failed to adequately allege that the claimed GAAP violations were made with scienter. Defendants further argue that they lacked scienter because they thought that their growth plans would buoy sales, and that Plaintiffs have alleged nothing more than fraud by hindsight—in other words, "Campbell misled investors because its business plan did not work." Finally, as to the individual defendants, Defendants claim that Plaintiffs improperly and inadequately impute knowledge and culpability to them, and that the individual defendants lacked motive and opportunity.

 Plaintiffs have not presented merely "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that,'" *see Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1019 (5th Cir.1996), but rather a detailed picture of the improper practices in which Defendants knowingly engaged to achieve ever-increasing sales and meet analysts' estimates. The picture Plaintiffs present is in startling contrast to the rosy picture consistently presented to Wall Street and the public. As alleged, Campbell's executives and the sales force scrambled and schemed to convince their customers to purchase more and more product, far more than those customers needed. And then the Company engaged in financial legerdemain to realize the sales as revenue and mask the improprieties of their sales tactics. Campbell's employees allegedly even raised with senior management their concerns that the practices were wrong. Meanwhile, throughout this period, Defendants allegedly failed to disclose any of this information to its investors. Numerous courts have recognized that scienter sufficiently pled as to a company's agents may be imputed to the company itself, and that is the case here. *See, e.g., In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1340 (S.D.Fla.1999); *In re Fine Host Corp. Sec. Litig.*, 25 F.Supp.2d 61, 71 (D.Conn.1998).

Thus, in addition to providing substantial circumstantial evidence, Plaintiffs have

also sufficiently pled motive and opportunity. Plaintiffs assert that Campbell's new management was determined to continue the Company's growth and meet Wall Street's expectations, and have identified statements to support this. These allegations clearly give rise to a strong inference that the Company acted with scienter in failing to disclose material aspects of its operations and performance.

■ As Plaintiffs present it, Defendants' allegedly improper accounting was part and parcel of their scheme to boost sales and earnings, and was accomplished with the same knowledge as the sales practices. For instance, in Plaintiff's view, the discounts were accounted for as SG & A expenses precisely to avoid having to report them as loss of revenue. Moreover, Plaintiffs contend that William Toler's memo requiring personal approval of any additional "guaranteed sales" supports Plaintiffs claim were, at best, reckless in their failure to establish a reserve for returns. Plaintiffs have not just alleged GAAP violations, which by themselves are insufficient to establish scienter, but also evidence of "corresponding fraudulent intent." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000) (citations omitted).

■ The Court also rejects Defendants' contention that Plaintiffs' allegation amount to little more than "fraud by hindsight." While the Court is mindful that "the attempt to impose liability on management for unrealized economic predictions [ ] is not actionable," *see Zucker v. Quasha,* 891 F.Supp. 1010, 1014 (D.N.J. 1995) (Bassler, J.) (citations omitted), Plaintiffs correctly insist that the Defendants' allegedly fraudulent statements were inaccurate or misleading at the time they were made. Defendants contend that, if "defendants believed that Campbell's growth initiatives would succeed, those initiatives would offset any adverse

impact on demand attributable to 'loading,' and therefore there could have been no fraudulent intent because defendants did not believe that any potential adverse effect would materialize." (Defs.' Mem. L. Supp. Mot. Dismiss at 18). That is simply not the case. Even if Defendants did not think that their improper behavior would "catch up with them," that does not somehow make their failure to disclose material information acceptable or negate their knowledge of the omission. *Cf. Pommer v. Medtest Corp.,* 961 F.2d 620, 622 (7th Cir. 1992) ("[J]ust as a statement true when made does not become fraudulent because things go unexpectedly wrong, so a statement materially false when made does not become acceptable because it happens to come true."). As Plaintiffs point out, the purpose of the securities laws—ensuring that investors have access to all material information—would be undermined if companies were permitted to withhold materially adverse information because they believed the company's fortunes would soon turn around.

■ While the issue of whether Defendants Morrison and Anderson acted with scienter is more difficult, the Court nevertheless finds Plaintiffs have sufficiently established such an inference. In *Advanta,* the Third Circuit warned that "allegations that a securities—fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate....'" 180 F.3d at 539 (quoting *Maldonado v. Dominguez,* 137 F.3d 1, 10 (1st Cir.1998)). "Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." *Advanta,* 180 F.3d at 539 (citing *Rosenbloom v. Adams, Scott & Conway, Inc.,* 552 F.2d 1336, 1338–39 (9th Cir.1977)).

However, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

In this case, Plaintiffs have specifically alleged that Defendants Morrison and Anderson were involved in discussions regarding the Company's sales and shipping practices and that, in these discussions, reservations were expressed about the propriety of these practices. On one occasion, Plaintiffs claim, Defendant Morrison rejected recommendations that the practices stop. On another occasion, he allegedly said that he did not want the "L" word—"loading"—used because it was hurting morale. Plaintiffs also allege that Defendant Morrison gave William Toler revenue targets, which then guided the levels of "loading" that occurred. Defendant Morrison allegedly also received memoranda regarding the status of the Company's sales efforts. Plaintiffs further claim that both Defendant Morrison and Defendant Anderson were involved in preparing the statements that the Company released to the public and filed with the SEC.

■■■ While asserting that defendants approved or helped prepare public disclosures is insufficient to establish knowledge of all aspects of the company's business, *see, e.g., Kennilworth Partners L.P. v. Cendant Corp.,* 59 F.Supp.2d 417, 428 (D.N.J.1999) (Walls, J.), knowledge may be imputed to individual defendants when the disclosures involve the company's core business. *See, e.g., In re Tel–Save Sec. Litig.,* No. 98–CV–3145, 1999 WL 999427, at *5 (E.D.Pa. Oct.19, 1999) ("Knowledge

concerning a company's key businesses or transactions may be attributable to the company, its officers and directors.") (citations omitted). U.S. soup sales are indisputably the bread and butter of Campbell's business, and, as the Company's CEO and CFO, respectively, Morrison and Anderson are presumed to have had pertinent knowledge. More importantly, though, Plaintiffs identify specific circumstances under which Defendants Morrison and Anderson had access to and received information about the sales efforts and the related accounting practices. *Cf. In re Cell Pathways, Inc. Sec. Litig.,* No. 99–725, 2000 WL 805221, at *7 (E.D.Pa. June 20, 2000). Thus, based on Plaintiffs' allegations, Morrison and Anderson's participation in public disclosures which they knew contained material misrepresentations constituted, at the least, recklessness and quite possibly conscious behavior, thus supporting a strong inference of scienter.

## IV. § 20 CONTROL PERSON LIABILITY

■■■ Section 20(a) creates liability for "controlling persons" in a corporation. 15 U.S.C. § 78t(a). To state a cause of action for control person liability, a plaintiff must allege (1) a primary violation by a controlled person or entity; and (2) "circumstances establishing control" of a primary violator. *See In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 940 (D.N.J.1998) (Lechner, J.). As discussed, Plaintiffs have adequately pled an underlying securities law violation.

"To establish a defendant is [a] control person, a plaintiff must allege that "the defendant had actual power or influence over the allegedly controlled [entity]." *Id.* Plaintiffs have alleged that Defendant Morrison, as President and CEO, and Defendant Anderson, as Vice President and CFO, "directly participated in the manage-

ment of the Company, [were] directly involved in the day-to-day operations of the Company at the highest level, and [were] privy to confidential proprietary information concerning the Company and its business, operations, [etc.] ... and were involved in drafting, producing, reviewing, approving, and/or disseminating" the allegedly misleading statements. (Am. Compl. at ¶ 22). Defendants are hard pressed to dispute that.

What Defendants do contend though is that Plaintiffs have failed to allege "culpable participation" by the alleged control persons. There is some dispute in the courts of this district about whether allegations of "culpable participation" are required at the pleading stage. In *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880 (3d Cir.1975), the Third Circuit stated that "secondary liability cannot be found under Section 20(a) unless it can be shown that the defendant was a culpable participant in the fraud." *Id.* at 890. In *In re Cendant Corp. Sec. Litig.,* 76 F.Supp.2d 539 (D.N.J. 1999), Judge Walls incorporated this requirement into his formulation of the prima facie case. *Id.* at 548.

However, as Plaintiffs argue, this formulation misinterprets *Rochez,* which, in Plaintiffs' view, requires "that the element of culpability be *proven* to impose liability on a securities law violator," 527 F.2d at 889–90 (emphasis added), but not that it necessarily be alleged. Other courts in this district have taken a similar view. In *MobileMedia,* Judge Lechner recognized that "culpable participation must be proved before control person liability for misrepresentations attaches," 28 F.Supp.2d at 940 (citing *Rochez,* 527 F.2d at 890), but held that, once a plaintiff establishes a prima facie case, it is the defendants' burden to prove the absence of culpable participation. *Id.* at 941. Similarly, in *Derensis v. Coopers & Lybrand*

*Chartered Accountants,* 930 F.Supp. 1003 (D.N.J.1996), Judge Bassler held that plaintiffs " 'need only plead circumstances establishing control because ... the facts establishing culpable participation can only be expected to emerge after discovery.' " *Id.* at 1013 (quoting *Easton & Co. v. Mutual Benefit Life Ins.,* Civ. No. 91–4012, 1992 WL 136857, at *6 (D.N.J. Mar.29, 1992) (Sarokin, J.) (further stating that "the majority of cases within this circuit (and the growing trend in other circuits) hold that plaintiff need only plead the circumstances establishing control")).

 The Court agrees with these cases insofar as they do not require Plaintiffs to allege "culpable participation" at the pleading stage. Because the Court is satisfied that the Plaintiffs have adequately alleged the underlying violations and that Defendants Morrison and Anderson were "control persons," Defendants' motion to dismiss the § 20(a) claims is denied.

## V. STATUTE OF LIMITATIONS

Defendants also allege that several aspects of Plaintiffs' Amended Complaint are barred by the applicable statute of limitations.

Claims brought under § 10(b) or Rule 10b–5 must be filed "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, et al.,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Because none of the parties have argued that the three-year cut-off is implicated here, the Court will focus on Plaintiffs' compliance with the one year limit.

While the Third Circuit has not addressed this issue in any significant way, the courts of this district appear to have adopted an inquiry notice standard for determining when the one-year limit is trig-

gered. *See, e.g., In re Prudential Ins. Co. of America Sales Practices Litig.*, 975 F.Supp. 584, 599 (D.N.J.1996) (Wolin, J.). Under the "inquiry notice" standard, "the time from which the statute of limitations begins to run is not the time at which plaintiff becomes aware of all of the narrow aspects of the alleged fraud, but rather the time at which plaintiff should have discovered the general fraudulent scheme." *Id.* (quoting *McCoy v. Goldberg*, 748 F.Supp. 146, 158 (S.D.N.Y.1990)).

In a recent decision, *Rothman v. Gregor*, 220 F.3d 81 (2d Cir.2000), the Second Circuit takes the issue of inquiry notice a step further than the courts of this district have, articulating a two-step analysis which addresses how the statute of limitations is implicated when a plaintiff does make a reasonably diligent investigation. In light of the fact that most of the published opinions in this district on this issue use Second Circuit jurisprudence as a starting point, it is important, in the absence of any direction from the Third Circuit, to reconcile the precedent in the district with the developing caselaw in the Second Circuit.

In *Rothman*, the Second Circuit explained that "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises...." *Id.* at 96 (quoting *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993)). Other courts have referred to such circumstances as "storm warnings" of culpable conduct. *See, e.g., National Rural Elec. Coop. Ass'n v. Breen Capital Servs. Corp.*, No. CIV. 00–722(WGB), 2001 WL 294086, at *3 (D.N.J. March 28, 2001) (Bassler, J.). Thus, first, the court must determine when the duty to investigate arose.

Second, though, a court "must further determine ... *when* knowledge of the

facts constituting the violation of section 10(b) and Rule 10b–5 will be imputed if, after the duty to inquire arises, the investor does indeed inquire." *Rothman*, 220 F.3d at 97. Thus, "the statute of limitations does *not* necessarily begin running upon the emergence of facts exciting inquiry into the specific possibility of fraud." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C–99–00109, 2000 WL 1727405 (N.D.Cal. Sept.29, 2000). The Second Circuit's approach has been adopted in several other circuits. *See Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir.1998); *cf. Berry v. Valence Tech., Inc.*, 175 F.3d 699 (9th Cir.1999); *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363 (7th Cir. 1997).

Defendants offer a strict formulation of the inquiry notice standard which is at odds with the *Rothman* formulation. As to the SG & A claim, they contend that, because the Plaintiffs cited in the original Complaint a press release from September 8, 1997, and an SEC disclosure filed on October 23, 1997, Plaintiffs must have been on inquiry notice of the alleged fraud at that time. However, the SEC disclosure at issue did not provide evidence of the SG & A claim at all, and in fact, was used by the Plaintiffs to demonstrate Defendants' failure to note the irregular accounting. Inquiry notice is not triggered by an omission which Plaintiffs would have had no reason to know at the time was an omission. The fact that Plaintiffs referenced the October 1997 SEC disclosure in January 2000 does not mean that they were then yet even aware of the omission regarding the SG & A accounting.

As to the loading claim, Defendants allege that Plaintiffs were on inquiry notice by June 1998, and at the latest by January 1999, based on security analyst reports published at that time. However, even if the Court were to consider such reports, it

is not clear that a reasonable investor would have been aware of them or that the reports would have put the reasonable investor on notice of the probability, or even possibility, of fraudulent conduct. Thus, Defendants do not credibly address when Plaintiffs' duty to investigate arose nor when a reasonably diligent investigation would have revealed the general fraudulent scheme. It is quite possible, as Plaintiffs maintain, that such an investigation would not sufficiently uncover the nature of the allegedly fraudulent accounting and loading practices until July 1999.

■ While inquiry notice may in some cases be determined as a matter of law, *see In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2000 WL 10211, at *3 (S.D.N.Y. Jan.6, 2000), it is inappropriate to dismiss claims as time-barred where, as here, the analysis is so fact-intensive. *Id.* ("the issue of constructive knowledge and inquiry notice should more properly be resolved by the trier of fact at a later stage of this litigation"); *Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 229 (S.D.N.Y.1997) (question of inquiry notice is "illsuited for determination on motion to dismiss"); *cf. In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 941 (D.N.J.1998).

However, even if the Court were to accept a date earlier than July 1999, the claims in the Amended Complaint clearly relate back to the original Complaint. Fed.R.Civ.P. 15(c). Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading[.]" *Id.* "Courts have liberally construed Rule 15(c) to allow amendments to relate back to the original pleading provided that the opposing party had notice of the claim and would not be prejudiced by the amendment." *Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 916 F.Supp. 1343, 1351 (D.N.J.1996) (Wolin, J.) (citations omitted). Moreover,

> the fact that an amendment changes the legal theory on which the action was initially brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading.... Indeed, an amendment that states an entirely new claim for relief will relate back as long as it satisfies the test embodied in the first sentence of Rule 15(c).

6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1497, at 94–99 (2d ed.1990) (citations omitted).[9]

■ Plaintiffs' new claims fit neatly within this Rule. Defendants were clearly on notice that the gravamen of Plaintiffs' case was Defendants' efforts to increase sales through allegedly fraudulent sales tactics and improper accounting. Particularly as this is a class action, in which amended class complaints are typical, Defendants have not been prejudiced. Plaintiffs' clarification and recasting of some of their claims upon further investigation is par for the course. As the Second Circuit stated, "[w]hen a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be." *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983). Defendants would like to require

---

**9.** Defendant's citation of *United States v. Thomas*, 221 F.3d 430 (3d Cir.2000), for the converse point misses the important fact that *Thomas* addresses Rule 15(c) in the unique context of § 2255 habeas petitions.

almost an exact identity of new claims to old. However, that is not what Rule 15(c) requires. Rather, Plaintiffs' new claims arose out of the same conduct, transaction—or, in this case, action—or occurrence set forth in the original Complaint, and thus relate back for purposes of Rule 15(c).[10]

## VI. CONCLUSION

For the reasons set forth above, this Court denies Defendants' Motion to Dismiss. The Court will enter an appropriate order.

---

10. Defendants also contend that the relation back doctrine precludes the Amended Complaint's expansion of the class period. The cases they cite purportedly hold that relation back is inappropriate where amendment involves new plaintiffs with new claims. (Defs.' Mem. L. Supp. Mot. Dismiss at 30 n. 29 (citing *Besig v. Dolphin Boating & Swimming Club*, 683 F.2d 1271, 1278 (9th Cir.1982); *Lester v. United States*, No. Civ. 95–1455, 1996 WL 819726, at *3 (D.Or. Nov.25, 1996))).

However, that is not the case here. The new plaintiffs—those who purchased Campbell stock between September 8, 1997 and November 18, 1997—have claims effectively identical to the rest of the class and seek identical relief. "As long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, his ability to protect himself will not be prejudicially affected if a new plaintiff is added, and he should not be permitted to invoke a limitations defense." 6A Charles Alan

Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1501 (2d ed.1987); *see also Besig*, 683 F.2d at 1278 ("An amendment changing plaintiffs may relate back when the relief sought in the amended complaint is identical to that demanded originally. In such a case, despite lack of notice, the defendant is not prejudiced because his response to the action requires no revision."). Additionally, the Court is satisfied with Plaintiffs' explanation that investigation subsequent to filing of the original complaint revealed new facts which warranted class expansion.

Moreover, insofar as Defendants' contention that Plaintiffs' amendment expanding the class period should be dismissed is predicated on the dismissal of the SG & A claim, (Defs.' Mem. L. Supp. Mot. Dismiss at 28 n. 25), because the Court is denying dismissal of the SG & A claim, dismissal of the amendment expanding the class period is also denied.